IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VIGILANT INSURANCE COMPANY, )<br>as subrogee of WQED MULTIMEDIA, )<br>      )<br>    Plaintiff, )<br>      )<br>    vs. )<br>      )<br>SPX CORPORATION d/b/a/ Dielectric and/or )<br>Dielectric Communications, )<br>      )<br>    Defendant. ) | Civil Action No. 06-23<br><br>Magistrate Judge Lisa P. Lenihan |

**MEMORANDUM OPINION AND ORDER**

**I. Conclusion**

The Motion for Summary Judgment filed by Defendant Dielectric will be granted for the reasons set forth below.

**II. Factual History**

This case involves an action by WQED's insurer, Vigilant, as subrogee, for economic loss owing to the removal, repair and reinstallation of a broadband antenna purchased by WQED from an entity which was then acquired by Defendant Dielectric (the entity from which WQED purchased the antenna, and its acquiring company, are collectively referred to herein as "Defendant").

More particularly, in 2001, WQED wished to expand its broadcasting capabilities to transition from analog to digital broadcasts. This required the installation of an additional antenna - specifically, one capable of broadcasting multiple channels simultaneously (*i.e.*, a "broadband antenna"). WQED consulted with Defendant and was provided with a list of acceptable antennas for its needs, which list included the one ultimately purchased (the "Antenna"). WQED also testifies that it was advised of the two different thicknesses of protective, ice and snow resistant coatings ("radomes") available on the antennas, and that it selected an antenna with the lesser coating both because it was less expensive and because there were concerns that WQED's existing antenna tower would not reliably support the additional weight and/or wind load of an antenna with a heavier weather coating.[1] WQED, through its Director of Engineering, Paul Byers, entered into a written contract in March, 2001, and testifies that it was aware of and agreed to the contract's one year express warranty for repair/replacement and other terms and conditions, including the waiver of other warranties. See Defendant's Memorandum of Law in Support at 3 (citing Statement of Material Facts at ¶¶ 19-

---

[1] Plaintiff appears to assert, in portions of its Memorandum of Law in Opposition that suggest a negligent misrepresentation claim, and in contradiction to WQED's testimony, that WQED relied on representations that the Antenna was appropriate for its geographic location. Compare Defendant's Memorandum of Law in Support at 3 (asserting that WQED selected the thinner radome "despite the suggestion [by the manufacturer] that a high-ice radome . . . would be appropriate" and "did not rely on any statement by [manufacturer or defendant] in choosing" the Antenna); Defendant's Reply Memorandum of Law at 6 (citing Mr. Byer's deposition testimony that he was not "relying upon any statement or representation" by Defendant in his decision to not select a high-ice radome) with Plaintiff's Memorandum of Law in Opposition at 2-3 (asserting that Defendant "presented a list of radomes as acceptable alternatives . . . [which list included] the Subject Antenna" and "did not state that . . . the Pittsburgh environment necessitated . . . a high-ice radome"). However, any fact questions of reliance on representations as to the most appropriate coating/radome are not material where, as here, an action for strict liability, negligent contract performance, or negligent misrepresentation is barred by Pennsylvania's economic loss doctrine. See discussion *infra*.

25).

The Antenna was installed and tuned in April, 2002 but, owing to problems which WQED was experiencing with the installation and operation of a transmission line, and the acquisition of transmitters (matters unrelated to the Defendant), the Antenna was only employed to transmit a single channel (rather than to transmit three channels, as originally intended) from April, 2002 through early January, 2004. Thus, the antenna was operating at *reduced* power during this period (including through the winter of 2002-2003).

In January, 2004, the transmission line problems were resolved and the Antenna began to be utilized for transmission of all three channels, *i.e.*, at full power. A severe snowstorm and "whiteout" occurred on January 6, 2004, and the Antenna failed, owing to the power reflected back by the weather conditions (which the coating/shield did not withstand).[2] Defendant removed the Antenna, provided a temporary replacement, performed repairs, and reinstalled the Antenna in late 2004. WQED understood the Antenna's failure to have occurred outside the contract's one-year warranty period (as did Defendant) and so referred its related expenses to its property and casualty insurer, Plaintiff Vigilant.[3] WQED attests that the only damage/expense incurred with the Antenna's failures was directly related to the repair and reinstallation of the Antenna itself. See id. at 6 (citing to Statement of Material Facts and deposition testimony); 13 (providing extensive citations to Statement of Material Facts and deposition testimony).

---

[2] See Defendant's Memorandum of Law in Support at 5 (asserting that WQED and its engineers believe these "unusually severe weather conditions caused the failure" of the Antenna by reflecting power back into it) (citing Statement of Material Facts at ¶¶ 45-46).

[3] See id. at 7 (citing to Statement of Material Facts and WQED's deposition testimony that the warranty had expired in May, 2003, and internal WQED e-mail indicating that Antenna was "six months out of warranty").

Plaintiff filed its Complaint in 2006, asserting counts for (1) negligence, (2) strict liability under the Restatement (Second) of Torts § 402(A), and (3) breach of warranty. Defendant's Motion for Summary Judgment asserts that the first two claims should be dismissed in accordance with Pennsylvania law, which bars recovery under the economic loss doctrine, and that the third claim should be dismissed because the contractual warranty had expired by its terms.

### III. **Summary Judgment Standard**

Summary judgment is to be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under applicable law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). And a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

All doubts as to the existence of a genuine issue of material fact are resolved against the moving party, and the entire record is examined in the light most favorable to the nonmoving party. Continental Ins. Co. v. Bodie, 682 F.2d 436, 438 (3d Cir. 1982). However, the nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 257.

Cf. Wausau Underwriters Insur. Co. v. Shisler, 2000 WL 233234, *5 (E.D. Pa. Feb. 28, 2000) (granting summary judgment against subrogee where deposition admissions of subrogor's employees established facts defeating claims).

IV. Analysis

    A. **Negligence and Strict Liability Claims**

A defendant's claims for negligent contract performance and strict liability under § 402(A) of the Restatement are quite clearly barred, under Pennsylvania's economic loss doctrine, where, as here, the undisputed evidence is that the damage/injury, related to a transaction between businesses in contract privity, was limited to the product itself. See REM Coal Company, Inc. v. Clark Equipment Co., 563 A.2d 128, 134 (Pa. Super. 1989) (*en banc*) (concluding that "negligence and strict liability theories do not apply in an action between commercial enterprises involving a product that malfunctions where the only resulting damage is to the product itself") (adopting doctrine established in East River S.S. Corp. v. Transamerican Delaval, Inc., 476 U.S. 858 (1986)).[4]

---

[4] See also Capricorn Power Co., Inc. v. Siemens Westinghouse Power Corp., 324 F.Supp.2d 731, 734 (W.D. Pa. 2004) (holding that "recovery in negligence and strict liability will not be allowed if the only injury that occurs is injury to the bargained for product because the law governing breach of warranty would be the appropriate cause of action"); New York State Elec. & Gas Corp. v. Westinghouse Elec. Corp., 564 A.2d 919 (Pa. Super. 1989) (affirming summary judgment for manufacturer where only economic losses resulted from shut-down and repair of product); 2-J Corp. v. Tice, 126 F.3d 539, 540-41 (3d Cir. 1997) (concluding that economic loss doctrine would preclude recovery for damages incurred when product fails "to perform as expected"); Palco Linings, Inc. v. Pavex, Inc., 755 F.Supp. 1269, 1271 (M.D. Pa. 1990) ("[T]o recover in negligence 'there must be a showing of harm above and beyond disappointed expectations' evolving solely from a prior agreement. A buyer's . . . 'desire to enjoy the benefit of his bargain is not an interest that tort law traditionally protects.'") (quoting Redarowicz v. Ohlendorf, 441 N.E.2d 324 (1982)).

5

Plaintiff's assertion that the Pennsylvania Supreme Court's decision in <u>Bilt-Rite Contractors, Inc. v. Architectural Studio</u>, 866 A.2d 270 (Pa. 2005), calls into question the Commonwealth's prior case law on the economic loss doctrine (or a "gist of the action" test),[5] is misguided. As Defendant correctly explains, the <u>Bilt-Rite</u> Court merely "held that tort claims for negligent misrepresentation resulting in economic damages could be brought against an architect in the business of supplying design plans *even though it had no contractual relationship* with the building contractor bringing the suit." Defendant's Reply Memorandum of Law at 2 (emphasis added); <u>see also id.</u> at 2-3 (providing extensive citations to post <u>Bilt-Rite</u> cases applying economic loss doctrine in products liability context); <u>Pennsylvania State Employees Credit Union v. Fifth Third Bank</u>, 398 F.Supp.2d 317, 327-28 (M.D. Pa. 2005) (explaining narrowness of <u>Bilt-Rite</u> holding and providing citations to Pennsylvania cases applying economic loss doctrine in other contexts).[6]

---

The doctrine's rationale was neatly articulated by Judge Pollack in <u>Hartford Fire Ins. Co. v. Huls America, Inc.</u>, 893 F.Supp. 465, 469 (E.D. Pa. 1995):

> [Where] an allegedly defective product causes damage only to itself, and other consequential damages resulting from the loss of the use of the product, the law of contract is the proper arena for redressing the harm because in such a case the damages alleged relate specifically to the product quality and value as to which the parties have had the opportunity to negotiate and contract in advance. . . . When the product fails to conform and only economic losses result, the parties' recovery . . . should be limited to an action on that contract an[d] no additional recovery in negligence or strict liability is permitted.

[5] <u>See</u> Plaintiff's Memorandum of Law in Opposition at 6, 9 (asserting former); 8 (asserting latter).

[6] <u>Compare</u> Plaintiff's Memorandum of Law in Opposition at 10 (incorrectly characterizing <u>Bilt-Rite</u> as applying a "more permissive approach . . . toward tort claims involving contractual relations") <u>with</u> <u>Bilt-Rite</u>, 866 A.2d at 456 (framing question as scope of action for negligent misrepresentation where there is no privity of contract). <u>Cf.</u> <u>Colacicco v. Apotext, Inc.</u>, 432 F.Supp.21 514, 543 n. 25 (E.D. Pa. 2006) (finding <u>Bilt-Rite</u> limited to

6

Moreover, even if Plaintiff were permitted to recast its negligent performance/contract misfeasance claim as negligent misrepresentation (as is inconsistently suggested in Plaintiff's Memorandum of Law in Opposition),[7] such claims would remain barred by the economic loss doctrine. See Duquesne Light Co. v. Westinghouse Electric Corp., 66 F.3d 604, 618-21 (3d Cir. 1995) (concluding that there was "no reason . . . to carve out an exception to [the economic loss doctrine] when the negligence consists of misrepresentation and parties were business entities engaging in arms-length transaction);[8] Capricorn Power, 324 F.Supp.2d 731 (concluding that plaintiff could not recover under negligence or negligent misrepresentation theories).[9] Indeed, the Third Circuit has predicted that Pennsylvania would apply its economic loss doctrine even to the tort of fraud where the contract claims are "intertwined". See Capricorn Power, 324 F.Supp.2d at 742 (citing Werwinski v. Ford Motor Co., 286 F.3d 661, 676-81 (3d Cir. 2002) (holding that doctrine would apply to intentional tort of fraud which did not arise independent of the underlying contract). Cf. Huron Tool & Engineering Co. v. Precision Consulting Servs., Inc., 532 N.W.2d 541, 545 (Mich. 1995) (finding exception where fraud was extraneous, rather

---

professional service claims and inapplicable to products liability litigation).

[7] Cf., *e.g.*, Plaintiff's Memorandum of Law in Opposition at 9 ("Vigilant's claims of negligence and strict liability allege improper performance by TCI and are not barred . . . .") id. at 10 (describing Defendant's asserted representation that Antenna was adequate as "misfeasance" and "failure to warn"). Compare *infra* n. 10.

[8] See also id. at 620 (noting that "courts in jurisdictions which have adopted the economic loss doctrine routinely have declined to carve out an exception for claims of negligent misrepresentation") (citations omitted); Freedom Properties, LP v. Lansdale Warehouse Co., Inc., 2007 WL 2254422, *6 (E.D. Pa. Aug. 2, 2007) (dismissing claims for negligent misrepresentation under economic loss doctrine).

[9] Cf. *supra* n. 1; Defendant's Reply Memorandum of Law at 6 (citing testimony of Mr. Bryer, that Defendant "made know that the high-ice radome was available and what the spec was for it, and . . . we made the decision that we didn't find it necessary").

than interwoven with breach of contract) (cited with approval in Werwinski).

Finally, to the extent Plaintiff suggests, in portions of its Memorandum of Law in Opposition which appear to conflate theories and analyses, that these claims may be permissible under a "gist of the action" analysis, they are not.[10] To the contrary, the gist of the action doctrine, like the economic loss doctrine, does not permit a tort action absent a factual basis that is primarily separate from/independent of the contractual relationship. See Pennsylvania State Employees Credit Union, 398 F.Supp.2d at 328 (discussing Pennsylvania case law, with citation to eToll, Inc. V. Elias/Savion Advertising, Inc., 811 A.2d 10 (Pa. Super. 2002)); Tier1 Innovation, LLC v. Expert Tech. Group, LP, 2007 U.S. Dist. LEXIS 34135, *12 (E.D. Pa. May 8, 2007) (dismissing claims for fraud and negligent misrepresentation where alleged statements were "inextricably interwined" with alleged failure to perform under contract). See also Bishop v. GNC Franchising, LLC, 2007 WL 2390427 (3d Cir. Aug. 23, 2007) (affirming dismissal of fraud and misrepresentation claims in franchise context as claims arose from breach of contractual duties). See also Markocki v. Old Republic National Title Ins. Co., 2007 WL 4142757, *6 (E.D. Pa. Nov. 19, 2007) ("Both the economic loss doctrine and the 'gist of the action' doctrine bar relief for a cause of action that is more contractual than tortious in nature.");

---

[10] See Plaintiff's Memorandum of Law in Opposition at 10 ("This . . . allegation of negligence [in representation] also survives the 'gist of the action' test."). But compare id. at 6-8 (describing gist of the action as a "more restrictive" test called into doubt by Bilt-Rite).

id. (noting that to survive under "gist of the action" doctrine, the contractual aspect of a claim must only be "collateral" to the tort claim); Retail Brad Alliance, Inc. v. Rockvale Outlet Center, LP, 2007 WL 403885, *8 (E.D. Pa. Jan. 31, 2007) (noting that "gist of the action" doctrine "precludes plaintiffs from recasting an ordinary breach of contract claim as a tort claim", *i.e.*, where claim is essentially duplicative and dependent/grounded on the contract).[11]

### B. Breach of the Contract/Warranty Claim

In the contract *sub judice* the seller's obligations were limited to repair or replacement for a period within one year from the date of delivery. See Defendant's Memorandum of Law in Support at 16 (citing to Statement of Material Facts and Exhibit 7). Moreover, the contract disclaimed other warranties in capital type in the body of its terms. See id.[12] And WQED has testified that it read and understood these express warranties and the disclaimers of any implied warranties and entered into the contract. See Defendant's Memorandum of Law In Support at 14-15, 16-17 (providing citations to Pennsylvania law and to Statement of Material Facts). See also Earl Brace & Sons v. Ciba-Geigy Corp., 708 F.Supp. 708, 709 (W.D. Pa. 1989) (holding, in granting summary judgment to manufacturer, that warranty terms are "clear and conspicuous if a reasonable person would have noticed and understood" them) (citing Thermo King Corp. v. Strick Corp., 467 F.Supp. 75 (W.D. Pa. 1979), *aff'd*, 609 F.2d 503 (3d Cir. 1979)); 13 Pa.C.S. § 2313, 2316 (warranty terms controlled by parties' agreements); 13 Pa.C.S. § 1201 (sufficiency of

---

[11] Cf. Defendant's Reply Memorandum in Opposition at 3-5 (providing citations to cases distinguishing economic loss doctrine, applied to products liability, and gist of the action, applied to professional services, cases).

[12] The contract provided that: "Seller's obligations under this warranty shall be limited to the repair or replacement . . . within one year from the date of delivery . . . ." It further disclaimed other warranties by stating: "THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED . . . ." See id.

exclusion of warranty is question of law); id. (illustrating sufficiency by use of larger type or capital lettering). There can be no action for breach of warranty (nor is there any basis for unconscionability, as suggested in Plaintiff's Memorandum of Law in Opposition)[13] where (a) the contract's warranty terms were appropriately disclosed; (b) those terms were admittedly read, understood and voluntarily entered into by the other party; and (c) the warranty period had expired.

Finally, although Plaintiff asserts that the defect was latent, rendering the express warranty's time limitation manifestly unreasonable,[14] this Court must disagree. This case is not analogous to the 15-day and 8-day limitations periods which effectively precluded warranty-period claims for product fumes only released on unpackaging/installation and non-blooming tulip bulbs, and were held invalid, in the cases which Plaintiff cites. If the randome were unsuitable for normal/typical Pittsburgh winter weather, such defect would generally be discoverable during the course of a winter. The Antenna was, however, not placed into full operation during the warranty-period winter for reasons entirely unrelated to Defendant's performance or product.[15] And the Complaint alleges no further performance problems with the

---

[13] See Plaintiff's Memorandum of Law In Opposition at 13-14 (asserting that disclaimer of merchantability/fitness was unconscionable). Compare Moscatiello v. Pittsburgh Contracts Equip. Co., 595 A.2d 1190 (Pa. Super. 1991) (holding that extreme reallocation of risks buried in fine print on reverse side of agreement was unconscionable) and cases cited in Defendant's Reply Memorandum of Law at 9-10.

[14] See Plaintiff's Memorandum of Law in Opposition at 11-12 (citing Neville Chemical Co. v. Union Carbide Corp., 294 F.Supp. 649, 655 (W.D. Pa. 1968) (holding 15 day limitation unreasonable where resin odor emitted from finished products not discoverable until delivery to end-users); 13 Pa.C.S. § 1204.

[15] Cf. Pagano v. Flakey Jake's of Greater Phila., Inc., 1995 WL 650241 (E.D. Pa. Oct. 31, 1995) (explaining that latent defect is one undiscoverable despite exercise of reasonable diligence).

Antenna during winter weather other than that occurring in January 2004. Plaintiff's assertions notwithstanding, the evidence of record does not include any indication that the Antenna was warranted to withstand "winter weather . . . conditions as severe as those in January 2004."[16] To the contrary, the representations alleged are that the Antenna/radome was an acceptable alternative for its geographic location (*i.e.*, sufficient to normal weather conditions). And it is WQED's testimony that it was aware of the high-ice radome option and independently elected to purchase the lower radome Antenna owing to cost and weight considerations, *i.e.* that it did not rely on representations as to the Antenna's winter-weather-worthiness.

Moreover, Plaintiff's assertion that an express time-limited warranty may be invalid whenever a product failure occurs, *i.e.*, that when there is delay in performance failure the defect was "latent", would simply prove too much. Indeed, the Third Circuit has adopted the general rule that "latent defects discovered after the term of the warranty are not actionable." Duquesne Light, 66 F.3d at 616 (cited with approval in Northeastern Power Co. v. Balcke-Durr, Inc., 1999 WL 674322, *5 (E.D. Pa. Aug. 23, 1999); see also Canal Elec. Co. v. Westinghouse Elec. Co., 973 F.2d 988, 993 (1st Cir. 1992) (noting that "case law almost uniformly holds that time-limited warranties do not protect buyers against hidden defects - defects that may exist before, but typically are not discovered until after, the expiration of the warranty period") (quoted with approval in Duquesne Light, 66 F.3d at 617).

## V. **Order**

For the foregoing reasons, this Court Orders as follows:

---

[16] Plaintiff's Memorandum of Law in Opposition at 13.

AND NOW, this 14th day of March, 2008:

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED** and that the Clerk of Court is to mark the case as closed.

                                                    LISA PUPO LENIHAN
                                                  United States Magistrate Judge